MICHAEL CHEROMIAH, Individually, and
DIANE M. CHEROMIAH, Individually and as
Personal Representative of the ESTATE OF
MICHAEL D. CHEROMIAH, deceased,

99 JUN 15 PM 3: 45

*Robt of Mormuel*
CLERK-SANTA FE

Plaintiffs,

vs.                                         CV No. 97-1418-MV/RLP

UNITED STATES OF AMERICA and ACOMA
CANONCITO LAGUNA HOSPITAL,

Defendants.

## PRETRIAL ORDER

THIS MATTER comes before the Court for approval of a Pretrial Order submitted

by the parties in <u>Cheromiah vs. United States</u>, No CIV 97-1418 MV/RLP, pursuant to

Rule 16 of the Federal Rules of Civil Procedure.

## APPEARANCES

For the Plaintiffs:          Randi McGinn
                             Kimberly Richards
                             McGinn & Associates, P.A.

                             Jim Bromberg
                             Sharp, Jarmie, and Scholl, P.A.

For Defendant United States:  Madeline Henley
                              Roger Einerson
                              U.S. Department of Justice, Washington, D.C.

                              Marilyn Hutton United States Attorney's Office,
                              Albuquerque, NM

1

## JURISDICTION AND PARTIES

Plaintiffs' First Amended Complaint alleges causes of action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346 (b)(1), 2671- 2680 (1994) and the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.A. §1395dd (1994), for medical negligence, wrongful death, and loss of consortium.

The parties agree that jurisdiction and venue in this action are based on the FTCA. Plaintiffs claim that jurisdiction and venue in this action are also based on EMTALA and this Court's pendant jurisdiction over Tribal law and/or New Mexico State law. The United States contends that the Court lacks subject matter jurisdiction over any claims against the United States under EMTALA, and that the law to be applied is New Mexico State law and not tribal law. (The EMTALA jurisdictional dispute is the subject of a pending motion to dismiss.)

Plaintiffs Diane and Michael Cheromiah and their son, Michael D. Cheromiah, resided in the City of Acomita, County of Cibola, State of New Mexico. Mrs. Cheromiah is a member of the Acoma Pueblo. Michael D. Cheromiah was a member of the Laguna Pueblo.

Defendant United States operates the Acoma-Canoncito-Laguna Hospital [ACL Hospital] in San Fidel, New Mexico.

2

## GENERAL NATURE OF THE CLAIMS OF THE PARTIES:

### I. Plaintiffs' Summary:

The United States government, by treaty, is responsible for supplying medical care on the Laguna, Acoma and other Indian reservations. The government has failed to live up to its promise to provide competent doctors and proper medical care for Native American citizens who live in Indian country. This case arises from the unnecessary death of a 21-year-old young man whose medical condition was ignored by the staff at the government run Acoma-Canoncito-Laguna Hospital. Michael D. Cheromiah went to ACL Hospital 4 times in 5 days complaining of intense chest pain. The government doctors at ACL Hospital failed to perform even the most basic diagnostic tests and therapeutic interventions to properly diagnose and treat Michael D. Cheromiah for what was a bacterial or viral infection around his heart. They kept sending him home, rather than to a specialist or an Albuquerque hospital. The undiagnosed and untreated bacterial or viral infection caused a pericardial effusion and tamponade that stopped his heart, ultimately resulting in his death.

### II. United States' Summary

This case arises out of the tragic death of Michael D. Cheromiah -- an event which fate and ill fortune conspired to cause, and one for which no individual is to blame. Michael D. Cheromiah was appropriately and caringly treated by four physicians at ACL Hospital, on four different days, for a viral syndrome. There is no specific anti-viral therapy; the virus must simply run its course. Here, the natural progression of the virus ultimately caused Michael D. Cheromiah's demise. Nothing

3

any federal employee did caused the virus, and nothing anyone did or could have done would have prevented the virus from taking its natural and fatal direction. The United States therefore cannot be held liable under the FTCA for Michael D. Cheromiah's death.

### III. Plaintiffs' Factual Statement

In October 1995, 21-year-old Michael D. Cheromiah, was living with his family in Acoma, New Mexico, and was working full time for the New Mexico State Highway Department. He was a lifelong member of the Laguna Pueblo.

Acoma-Canoncito-Laguna Hospital is an acute care facility owned and operated by the Indian Health Service, a branch of the United States government. ACL Hospital operates a 24-hour per day Emergency Department for the benefit of tribal members of the Acoma, Laguna and Canoncito reservations. It is located within the bounds of Acoma tribal lands. The next nearest acute care facility is in Grants, New Mexico, approximately 20 miles away. The nearest tertiary hospital facility, providing a full range of special services, is in Albuquerque, New Mexico, approximately 70 miles away.

**The Events of October 31-- November 3, 1995**

On October 31, 1995, at 1:10 a.m., Michael, a formerly healthy young man, was rushed to the emergency room at ACL Hospital complaining of **chest pain on his left side that worsened when he breathed**. Michael had been suffering from chills since 4:30 the preceding morning. He had a fever of 101.1 F and the back of his throat was a "beefy red" color. The ACL Emergency Department physician did minimal testing and

4

examination. The physician, Maureen Kelly, M.D. **sent Michael home**, recommending bed rest and ibuprofen.

Two days later, on November 2, 1995, Michael returned to ACL Hospital accompanied by his mother, Diane Cheromiah. He was experiencing continuing fever, muscle pains, and three days of vomiting. Diane Cheromiah informed the ACL Hospital physician, Phillip Friedman, M.D., that Michael was unable to "[keep] anything down." Michael had a fever of 101.5 F, a heart rate of 132, and a rapid respiratory rate. The back of his throat was red, with an exudate present, and the lymph nodes in his neck were now tender to palpitation. Laboratory tests were distinctly abnormal, with a high white blood count with significant left shift,[1] and a low platelet count.[2]  Testing revealed a significant drop in blood oxygen saturation from 98% on October 31 to an abnormally low 92% on November 2. ACL doctors believed that Michael was sufficiently ill to require intravenous fluid infusion. Despite his obvious inability to keep water and medication down, his having failed a trial of oral antibiotics from his private doctor, **Michael was sent home** with another prescription for low dose oral antibiotics.

In the early morning of November 3, 1995, less than 12 hours after his last discharge from ACL Hospital, Michael returned to the Emergency Department at ACL Hospital for the third time in four days. He was again complaining of chest pain, now

---

[1] A left shift indicates the release of immature white blood cells from the bone marrow, indicative of stress on the immune function.
[2] Platelets are those cells in the blood that permit clotting. Thrombo cyto penia, an abnormally low platelet count, is often indicative of sepsis.

aggravated by lying down. He also had a new complaint: difficulty breathing. Michael's oxygen saturation remained depressed at 93%; he had a fever of 99.9 F, an elevated heart rate, and a rapid respiratory rate. The ACL Hospital Emergency Department physician, Gerald Hepnar, M.D. **sent Michael home** with advice to take Tylenol. There was *no mention* of the abnormal vital signs, physical findings, and laboratory abnormalities discovered earlier in the day; despite chest pain and **shortness of breath**, there *was no cardiac exam.* Despite the fact that Michael was seriously and acutely ill, and his physical condition was clearly deteriorating, Dr. Hepnar did not confer by phone with any specialists, did not consider hospitalization and did not refer Mr. Cheromiah to a cardiac or infectious disease specialist in Albuquerque.

On November 4, 1995, Michael lost consciousness at home and was transported by ambulance back to ACL Hospital. Upon arrival, he was having difficulty breathing. This was Michael's fourth attempt to seek emergency care. His blood pressure had dropped to 77/38, his heart rate was into the 140s, and had a rapid respiratory rate. His breath sounds were abnormal and his heart sounds were distant. His white blood count was further elevated with a marked left shift, and his platelet count remained low. Laboratory test results were abnormal indicating liver dysfunction and severe metabolic derangement. Michael was, at this point, suffering from Systemic Inflammatory Response Syndrome (SIRS). The Emergency Department physician, Stefanie Fry, M.D., interpreted radiographic changes as being consistent with massive accumulation of fluid in the pericardium sufficient to inhibit the pumping action of the heart: Michael was in shock from cardiac tamponade secondary to acute pericarditis and massive

6

pericardial effusion. The EKG was abnormal, indicating possible pericardial inflamation. The physician was appropriately alarmed by Michael's condition and had him transported to Presbyterian Hospital via ambulance for the purpose of emergency cardiologic consultation and pericardiocentesis.[3]

When Michael arrived at Presbyterian Hospital, he was taken to the cardiac catheterization lab for pericardiocentesis. Unfortunately, it was too late. Michael was already *in extremis*, and suffered cardiac arrest. Michael died at 1:56 p.m. on November 4, 1995. The attending physician opened Michael's chest in an attempt to resuscitate him via direct cardiac massage. At that time, the doctors discovered a liter of blood in the pericardial space; according to Dr. Lagerstrom this blood had been present for a very short time – certainly no longer than several minutes to hours. This massive accumulation of fluid in the pericardial space was caused by the undiagnosed and untreated viral or bacterial infection.[4] Prompt diagnosis and appropriate treatment of this acute infection would have kept the infection from causing a pericardial effusion that tamponaded Michael's heart. Because of his young age and generally healthy condition, Michael's life could have been saved when he attempted to receive medical care at ACL Hospital on October 31, November 2, and November 3.

Dr. Friedman and Dr. Hepnar violated the standard of care in their inadequate treatment of Michael Cheromiah. Even the government's experts, Drs. Mertz and

---

[3] Pericardiocentesis is drainage of the fluid in the pericardial space via a needle.

[4] Alternatively, some of the blood and fluid around Michael Cheromiah's heart may have been caused by iatrogenic trauma caused by the physicians. Some of the invasive procedures used in the attempt to resusciate Michael at Presbyterian Hospital may have generated additional bleeding in the

7

Doezma, found the care that Michael received on November 3, 1995 "troubling." Another defense expert, Dr. Lesch, testified that the doctors' failure to look at both of Michael Cheromiah's X-rays violated the standard of care.[5] Another defense expert, Dr. Blanchard, testified that the failure to obtain an EKG violated the standard of care. All of the defense expertsagree that the care Michael received at ACL Hospital was either troubling or violated the standard of care in some manner.

### IV. United States' Factual Statement:

Michael D. Cheromiah died of a tragic and rare complication of a viral syndrome. Within the span of several days, Mr. Cheromiah succumbed to a viral infection that first manifested itself with the fever, aches, cough, and nausea commonly associated with viral syndromes, and later extended into his pericardium,[6] caused a pericardial effusion,[7] and damaged his myocardium,[8] finally causing death. Unfortunately, there is no specific therapy for viral illnesses; they must simply run their course. Michael D. Cheromiah suffered cardiorespiratory arrest in the Catheterization Lab at Presbyterian Hospital on November 4, 1995. The two physicians at Presbyterian who were present when Mr. Cheromiah's chest was opened during thoracotomy formed the impression that Mr. Cheromiah had exsanguinated -- bled to death -- through a rupture in his heart

---

space around the heart. This iatrogenically induced bleeding did not contribute to Michaels cardiopulmonary arrest and death.

    5 Dr. Friedman failed to look at either of Michael Cheromiah's X-rays that were taken on November 2, 1995 and again on November 4, 1995. Dr. Hepnar only saw the November 2, 1995 X-ray but made *no mention* in his notes of the radiologic abnormalities discovered on November 2, 1995. Yet, Dr. Stevenson, a doctor who read Michael's X-ray, commented that "perivascular infiltrate in the right base, which could be consistent with a pneumonia" was present.

    [6] The pericardium is the fibroserous sac that surrounds the heart.

    [7] A pericardial effusion is the accumulation of an abnormally large amount of pericardial

8

muscle. Mr. Cheromiah's heart was deemed irreparable and he could not be resuscitated. The family of Mr. Cheromiah refused to authorize an autopsy.

Michael D. Cheromiah was twenty-one years old at the time of his death. He was a high school graduate, with a sketchy academic record, and had taken a few classes in welding at New Mexico State University in Grants although he was not enrolled as a student at the time of his death. Mr. Cheromiah had a job as a laborer doing road repair for the New Mexico State Highway Department. For his young age, he had a striking history of alcohol abuse and had been cited and arrested for reckless driving and disorderly conduct.Mr. Cheromiah was treated at ACL Hospital on October 31, November 2, November 3, and November 4, 1995 by four different physicians: Dr. Maureen Kelly, Dr. Phillip Friedman, Dr. Gerald Hepnar, and Dr. Stefanie Fry.[9] Each of these four physicians, plus the two physicians who treated him at Presbyterian Hospital in Albuquerque where he was subsequently transferred, believed that he had a viral illness.[10]

Each doctor who treated Michael D. Cheromiah at ACL Hospital performed an

---

fluid in the pericardium.

[8] The myocardium is the heart muscle itself.

[9] Dr. Maureen Kelly, a locum tenens contract physician from the University of New Mexico treated Mr. Cheromiah on October 31, 1995. Dr. Phillip Friedman treated Mr. Cheromiah on November 2, 1995. Dr. Gerald Hepnar treated Michael D. Cheromiah on November 2, and November 3. On November 4, 1995, Mr. Cheromiah was treated by Dr. Stefanie Fry, a locum tenens contract physician from the University of New Mexico. Dr. Hepnar and Dr. Friedman were federal employees during the time period at issue in this litigation. Neither Dr. Kelly nor Dr. Fry was a federal employee in October and November of 1995. The United States cannot be held liable under the FTCA except for the acts and omissions of federal employees acting within the scope of their employment.

[10] On October 31, 1995, after going to ACL Hospital, Mr. Cheromiah also saw a private physician, Dr. Gilbert Gutierrez, who diagnosed him as having a URI (upper respiratory tract infection) and prophylactically prescribed antibiotics.

9

appropriate medical screening exam, and on each day, Michael D. Cheromiah's condition was stabilized. No physician violated ACL Hospital procedure or protocol in screening Michael D. Cheromiah, and he was not treated any differently than any patient presenting to ACL Hospital with similar complaints would be treated. No violation of EMTALA occurred.

Neither was there a violation of the standard of care by any physician at ACL Hospital.11 Each performed a physical examination and ordered tests where necessary. Mr. Cheromiah was attended to, supportive care was prescribed, directions for follow-up care were given. No medications other than pain and fever reducers were prescribed because no anti-viral agents exist. On the morning of November 4, 1995, Michael D. Cheromiah's condition precipitously and dramatically deteriorated. Mr. Cheromiah was transported to ACL Hospital by ambulance where cardiac tamponade -- compression of the heart caused by the fluid in the pericardium -- was promptly diagnosed and he was appropriately transferred to Presbyterian Hospital. It was expected that Mr. Cheromiah would undergo pericardiocentesis, a procedure in which the fluid would be drained from the pericardium by a needle, and that his condition would improve. Dr. Barry Ramo was unable to successfully perform the procedure, however, and called the cardiac surgeon, Dr. Carl Lagerstrom, to attempt a different

---

11 Plaintiffs' in their Factual Statement have misrepresented the deposition testimony of the United States' expert physicians.

drainage procedure.[12] In the interim, Mr. Cheromiah died.

Doctors Ramo and Lagerstrom dictated contemporaneous notes describing their findings when Dr. Lagerstrom performed the thoracotomy. Both physicians described the "huge" amount of blood that poured out of Michael D. Cheromiah's pericardial sac when it was opened, as well as the presence of old and more recent blood clot, as well as free blood. Both physicians' notes remark on the continuous blood loss. The physicians also note the abnormal appearance of the heart, describing it as friable (easily pulverized or crumbled) and erythematous (red). They postulated that the most likely explanation for these unusual findings was that Mr. Cheromiah has suffered a myocardial rupture; he was bleeding from a hole in his heart.

In March of 1997, plaintiffs submitted an administrative claim in which they alleged that Michael D. Cheromiah suffered from an "acute bacterial infection . . . which led to sepsis, pneumonia, pericarditis, myocarditis, pericardial iffusion [sic], myocardia [sic] rupture, and death." In October of 1997, they filed suit in federal court alleging that "Michael D. Cheromiah's bacterial infection progressed to form a metastatic infection in the myocardium" and that "by the time Michael D. Cheromiah arrived at Presbyterian Hospital it was too late to save him. The untreated bacterial infection in and around his heart had caused a rupture of the myocardium." Plaintiffs amended

---

[12] At Presbyterian Hospital on November 4, 1995, Michael D. Cheromiah was treated by Dr. Barry Ramo and Dr. Carl Lagerstrom, neither of whom were federal employees. The United States cannot be held liable under the FTCA except for the acts and omissions of federal employees acting within the scope of their employment.



11

their complaint in November of 1997, but these and related allegations remained the same.

One year later, in November 1998, plaintiffs submitted four expert physician reports. The reports prepared by their experts, including an infectious disease expert, supported plaintiffs' allegations that Michael D. Cheromiah had bacterial myocarditis and ruptured his heart.

Then, in February of this year, plaintiffs' infectious disease expert announced that she had changed her opinion and that the most likely etiology of the Michael D. Cheromiah's infectious process was viral. With this startling change of opinion, plaintiffs were forced to change their theory of the case. If the myocardium had been "destroyed" by an infection, as plaintiffs alleged and as their experts' reports concluded, and if that infectious process was viral in origin and not bacterial, then plaintiffs could not establish "proximate cause" because no medical treatment would have prevented the virus from destroying Michael D. Cheromiah's heart. Accordingly, all of plaintiffs' experts, at their depositions, abandoned the view that Michael D. Cheromiah had myocarditis and ruptured his heart. But how now to explain the "exsanguination" and abnormal looking heart described by the contemporaneous notes of doctors Ramo and Lagerstrom on which plaintiffs and their experts had initially relied? Some of plaintiffs' experts now speculate that the blood and clot doctors Ramo and Lagerstrom found resulted from the disease process itself, and /or resulted from punctures inflicted during the pericardiocentesis, while another testified that the blood and abnormal looking heart resulted from chest compressions during CPR. Plaintiffs' explanation for their complete

12

change of theory (offered in response to a request for admission propounded by the United States), is that "further discovery" caused them to "learn[] that a bacterial infection did not destroy Michael's heart muscle." Yet, plaintiffs can point to **no fact** that they learned after their experts submitted their reports to explain this change. The only thing plaintiffs learned was that they could not prevail on their allegation that Mr. Cheromiah had a bacterial infection because even their own expert would not support that theory.[13]

Each of the United States' medical experts, including an infectious disease specialist, has, from the start, been of the opinion that Mr. Cheromiah suffered from a viral illness. Plaintiffs' own expert in infectious disease now agrees that the illness was more probably viral. Indeed, plaintiffs herein as much as concede that they cannot prove that it is more likely than not that Michael D. Cheromiah had a bacterial infection.

Each of the United States' medical experts, including an expert cardiologist, has, from the start, been of the opinion that Mr. Cheromiah suffered from cardiac

---

[13] Plaintiffs and their experts have fluctuated and been inconsistent with regard not only to their theories of liability but also with respect to **who** breached the standard of care. The original complaint in this action named Dr. Friedman, Dr. Kelly, and Dr. Hepnar as individual defendants, along with ACL Hospital and the United States. The First-Amended Complaint named only Dr Hepnar individually. Two of the four physicians who submitted expert reports for plaintiffs found no breach of the standard of care by Dr. Kelly. Currently, plaintiffs claim that Dr. Friedman and Hepnar breached the standard of care, but that Dr. Kelly did not. However, Plaintiffs would not agree to stipulate that they have no claims of medical negligence against Dr. Kelly. In addition, after alleging that EMTALA was violated on each of the four days that Mr. Cheromiah was treated at ACL Hospital, plaintiffs dropped their claim that EMTALA was violated on November 4, 1995 (the day that Michael D. Cheromiah was treated by Dr. Stefanie Fry). Moreover, with the submission of their draft Pre-trial Order, plaintiffs for the **first time** indicated that they have a claim of professional negligence against Dale Gaddis, the nurse who treated Michael D. Cheromiah on November 3, 1995. Moreover, although they acknowledge that they have no such claim at this time, Plaintiffs' refuse to stipulate that they have no claims of negligence against the other medical and EMS personnel who had contact with Michael D. Cheromiah on the days at issue.

tamponade, perimyocarditis,[14] and myocardial rupture. No one knows for sure what happened to Michael D. Cheromiah's heart because this is unknowable. The only thing that would have allowed plaintiffs to establish by a preponderance of the evidence what caused Michael D. Cheromiah's death and thus whether anything could have been done to avert it was declined by plaintiffs themselves: an autopsy. What is certain was documented in the contemporaneous notes of two independent treating physicians with no stake in this lawsuit and no allegiance to either party, and their view was that Michael D. Cheromiah had perimyocarditis with rupture of his heart.

Michael D. Cheromiah died of viral infection that caused perimyocarditis and rupture of his heart and he bled to death. The physicians at ACL Hospital did not cause Michael D. Cheromiah to be infected with this virus, their treatment was appropriate and met standard of care, and, in any event, was not the proximate cause of Michael D. Cheromiah's death.

### V. Plaintiffs' Legal Claims:

**A)** **FTCA Claims** -- The government and ACL Hospital were on notice that ACL Hospital was inappropriately staffed with unqualified personnel, understaffed and providing substandard medical care to Indians on the reservation before and at the time of Michael D. Cheromiah's visit. Despite that knowledge, the government failed to take steps to provide adequate health care to Indian patients like Michael. The government and its employees at ACL Hospital violated the standard of care and were negligent in failing to correctly diagnose and treat the bacterial or viral infection that

---

[14] Perimyocarditis denotes the joint appearance of pericarditis and myocarditis.

14

caused a massive pericardial effusion that tamponaded Michael D. Cheromiah's heart. The government and its employees at ACL Hospital were negligent in failing to conduct an appropriate work-up, arrive at a reasonable diagnosis, or institute proper treatment, including hospitalization, transfer and appropriate specialty consultation. These acts and omissions proximately caused the death of Michael D. Cheromiah in violation of the FTCA. The FTCA, 28 U.S.C. §1346(b), directs the Court to apply the substantive tort law of the place of the occurrence. The tort law that applies to this medical malpractice case is Acoma Tribal law. Acoma tribal law has no cap on damages for medical malpractice cases and, like New Mexico law, allows damages for wrongful death, economic value of life, loss of the value of life, pain and suffering, loss of value to the tribe, loss of consortium, loss of chance and aggravating circumstances.

      B)    **EMTALA**[15] **Claims**: The United States violated EMTALA, 42 U.S.C. §1395dd, by failing to conduct an appropriate medical screening examination in the emergency room and **discharging Michael three (3) times** without providing stabilizing treatment.

On October 31, 1995, the ACL Hospital doctor failed to perform fundamental laboratory studies on Michael. It is probable that appropriate testing would have been abnormal and led to the proper diagnosis and treatment of Michael. On November 2, the ACL Hospital physician failed to obtain a proper history, to appropriately evaluate

---

[15]  EMTALA is an act that establishes standards for basic emergency medical care. Violation of those standards constitutes a strict liability violation of the act which gives rise to both compensatory and punitive damages.

the testing that he ordered, and to institute a proper therapeutic plan. Appropriate supportive care, monitoring, antibiotic therapy, and consultation, performed in an inpatient setting, would have resulted in Michael's survival. On November 3, 1995, the ACL Hospital doctor failed to review prior medical records, obtain even a rudimentary history, conduct an appropriate physical exam, or order even the most basic of laboratory investigations. Appropriate intervention by the physician on November 3, including appropriate therapy, transfer to a hospital, and appropriate specialty consultation, would have resulted in Michael's survival. Michael suffered from an emergency medical condition on each occasion that he sought help at ACL Hospital. These egregious failures on the part of ACL Hospital and its medical staff to provide appropriate medical screening examinations and necessary stabilizing treatment are violations of the standards for hospital care established by EMTALA. EMTALA provides for a jury trial and punitive damages.

**C.) Loss of Consortium** - Under New Mexico law, a parent's claim for loss of consortium with an adult child is a separate cause of action. Under the applicable substantive law of Acoma Pueblo, the valuation of the familial relationship is held to support very high damages. The recent case of Fernandez v. Walgreen Hastings Co. (filed October 22, 1998) in the New Mexico Supreme Court expands the consortium theory in the state of New Mexico to include those family members who are living with the deceased, as were Diane and Michael Cheromiah, Sr. The Acoma or Laguna courts would rule in a similar fashion under tribal law.

### VI. United States' Legal Defenses

The United States is the only proper party to this lawsuit, and plaintiffs' cause of action for medical negligence under the FTCA (Count III of the First Amended Complaint) is the only cause of action over which this Court has subject matter jurisdiction.[16]

The United States can be held liable only for the negligence acts or omissions of its employees acting within the scope of their employment. Only two of the seven doctors who treated Mr. Cheromiah were federal employees, Dr. Gerald Hepnar and Dr. Phillip Friedman. The United States cannot be held liable for the negligent acts or omissions of Dr. Maureen Kelly or Dr. Stefanie Fry. Neither can the United States be held liable for the negligent acts or omissions of Dr. Gilbert Gutierrez, Dr. Barry Ramo, or Dr. Carl Lagerstrom. Moreover, the United States cannot be held liable for the comparative, contributory, or intervening negligence of Michael D. Cheromiah or any third party. Thus, to the extent that Michael D. Cheromiah or any non-federal employee contributed to Michael D. Cheromiah's harm, the United States cannot be liable for causing that harm. In addition, if the Court finds negligence by any individual who was not a federal employee at the time, the United States is not, under New Mexico law,

---

[16] There are pending motions to dismiss Counts I and Count II (EMTALA) for lack of subject matter jurisdiction, as well as Count V (Loss of Consortium) because New Mexico does not recognize a cause of action for loss of consortium for the parents of an adult child. On June 1, 1999, the parties filed a Consent Order seeking dismissal of Count IV as duplicative of Count III. Thus, if the United States prevails on its pending motions, Count III will be the only Count remaining.

17

jointly liable for any injury caused by that individual.

In any event, none of the physicians at ACL Hospital breached the standard of care, and no act or omission by any physician at ACL Hospital was the proximate cause of Michael D. Cheromiah's death. Plaintiffs bear the burden on each of these issues as well as on damages. Expert testimony on hedonic damages, which plaintiffs propose to offer, should be disallowed.

The United States also cannot be liable under the FTCA beyond the limited waiver of sovereign immunity contained therein. Under the FTCA plaintiffs are not entitled to a trial by jury, to punitive damages, to pre-judgment interest, or to post-judgment interest except as provided by federal law, or to a strict liability standard. Moreover, the United States has waived its sovereign immunity to be sued only in accordance with New Mexico State law. Plaintiffs continue to persist in the position that the Court should apply tribal law despite the absence of any case law support and in the face of ample precedent to the contrary.[17]

---

[17] See Red Elk v. United States, 62 F.3d 1102, 1104 (8th Cir. 1995) (South Dakota law applied to tort suit arising from rape by tribal police officer); Goodman v. United States, 2 F.3d 291, 292 (8th Cir. 1993) (applying South Dakota law in FTCA medical malpractice claim against Indian Health Service hospital in Pine Ridge); Chips v. United States, No. 92-5025 at 4 (D. SD Apr. 28, 1993) (South Dakota substantive law applied in FTCA case occurring on Pine Ridge Indian Reservation because "for purposes of a federal tort claims act case which arises on an Indian reservation, the substantive law of the state in which the reservation is situated governs the dispute."); Azure v. United States, CV-90-68-GF-PGH (D. MT May 9, 1991) (Hatfield, C.J.) (Montana law, not Blackfeet Tribal Code, governs in FTCA action); Seyler v. United States, 832 F.2d 120, 121 (9th Cir. 1987) (applying Idaho law to FTCA action arising out of incident occurring on road maintained by BIA on Coeur d'Alene Pueblo); Abernathy v. United States, 773 F.2d 184 (8th Cir. 1985) (South Dakota law applied in FTCA suit against Indian Health Services hospital); Bryant v. United States, 565 F.2d 650, 652 (10th Cir 1977) (New Mexico law applied to tort suits for failure to supervise children enrolled at BIA school on Indian reservation); Muhammad v. United States, 366 F.2d 298, 299-300 (9th Cir. 1966) (Arizona law applied to automobile accident occurring on Indian reservation), cert denied, 386 U.S. 959 (1967).

As several decisions in this District have held, the United States' liability under New Mexico law in this FTCA/wrongful death case cannot exceed $600,000. See N.M. Stat. Ann. ' 41-5-6. Plaintiffs' demand far exceeds this amount.

Plaintiffs' complaint alleges a cause of action for loss of consortium, but as is shown in the United States' motion, New Mexico has not and would not recognize a cause of action for loss of consortium for the parents of an adult child.

The Court lacks jurisdiction under EMTALA because the United States has not consented to a suit for money damages under EMTALA and, absent such waiver of sovereign immunity, neither the United States nor its agencies may be sued.

Moreover, plaintiffs cannot prevail on the merits of their EMTALA claim because they cannot establish --nor have they even alleged -- that ACL Hospital violated its standard screening protocol or treated Mr. Cheromiah any differently than it would have treated another patient with the same complaints. On each day at issue ACL Hospital gave Mr. Cheromiah appropriate screening exams and stabilized him as required by EMTALA. In addition, plaintiffs cannot establish entitlement to damages on their EMTALA claims, and certainly not to punitive damages.

## STIPULATIONS AND UNCONTROVERTED FACTS

The following facts are established in the pleadings or by stipulations of counsel:

1.      United States of America operates the Acoma-Canoncito-Laguna Hospital, an Indian Health Services Facility, in San Fidel, New Mexico.

2.      ACL Hospital is situated on land leased by Acoma Pueblo to the federal government for the construction, maintenance, and use of an IHS facility. The lease

19

approved by Acoma Pueblo and the federal government was executed in 1973.

3.     Michael D. Cheromiah was seen at ACL Hospital on October 31, 1995, at 12:10 a.m.

4.     After being seen at ACL Hospital on October 31, 1995, Michael D. Cheromiah presented to the private office of Dr. Gilbert Gutierrez for treatment on October 31, 1995.

5.     Michael D. Cheromiah was seen at ACL Hospital on November 2, 1995, at 15:25 p.m.

6.     Michael D. Cheromiah was seen at ACL Hospital on November 3, 1995, at 2:30 a.m.

7.     Michael D. Cheromiah was seen at ACL Hospital on November 4, 1995, at 10:05 a.m.

8.     The United States cannot be held liable for the acts or omissions of doctors Fry, Gutierrez, Ramo, and/or Lagerstrom.

9.  Plaintiffs are not making any claims of negligence against Dr. Stefanie Fry.

10.  Dr. Gerald Hepnar was a federal employee acting within the scope of his employment on November 2 and November 3, 1995.

11.     Dr. Phillip Friedman was a federal employee acting within the scope of his employment on November 2, 1995.

## DISCOVERY

Formal discovery was completed on May 17, 1999.

## EXHIBITS

### I.    Diane and Michael Cheromiah:

Plaintiffs Cheromiah may introduce the following exhibits at trial:[18]

1. Medical bills for services rendered to Michael D. Cheromiah;

2. Summary of Michael D. Cheromiah's medical bills;

3. Counseling records for Diane Cheromiah;

4. All medical records for Michael D. Cheromiah;

5. Summary of Michael D. Cheromiah's medical records;

6. Opinion of Judge Melvin Stoof;

7. ACL Medical Staff Meeting Notes;

8. Complaints filed at ACL Hospital;

9. Statistics on mortality rates;

10. Regional statistics regarding Indian healthcare;

11. Portions of the ACL Hospital budget;

12. Portions of the Indian Self-Determination Act;

13. Treaty;

14. Portions of the Anti-Deficiency Act;

15. Deposition excerpts from Drs. Kelly, Hepnar, Friedman, Fry; Dale Gaddis, Judith McNeil, and any ACL employee;

16. Photographs of Michael D. Cheromiah;

---

[18] Defendant objects to several of plaintiffs' proposed exhibits and will make its objections at the appropriate time.

17. Economists report or demonstrative chart;

18. Demonstrative aids of testing procedures used to determine pericardial effusion and pericarditis;

19. Photos/diagram of ACL Hospital;

20. Demonstrative diagrams/photos of body parts and pericarditis;

21. Training videotapes of proper testing procedures for pericarditis;

22. Learned treatises on bacterial infections, viral infections, pericarditis, cardiogenic shock, including testing, diagnosis and statistics for risk and survival;

23. Powerpoint opening statement and possibly closing argument;

24. Selected documents from the materials Plaintiffs recently received from ACL Hospital in response to Plaintiffs Second and Third Set of Requests for Production;

25. Portions of the EMTALA Statute (42 U.S.C.A. §1395dd), along with any regulations and inspection guidelines;

26. 42 U.S.C. § 231 of the Public Health Act – Contracting Physicians, along with any accompanying Regulations.

27. UNM Locum Tenens Agreement;

28. Demonstrative Aids from Trends in Indian Health 1997 and 1995;

29. Photographs of Michael Cheromiah's family;

30. Deposition transcript and deposition excerpts of any and all individuals deposed in this case;

31. Any ACL Hospital Policies and Procedures Manuals, including but not limited to the Emergency Room Policies; the Ambulatory Care Clinic Policies; any and all protocols; and other similar documents;

32. Videotape deposition of Dr. Barry Ramo;

33. Demonstrative Aids – Therapeutic aids used to perform a pericardiocentesis;

34. Demonstrative aids used to show the physiology and pathophysiology experienced by

Michael Cheromiah's condition;

35. Demonstrative aids used to show the clinical findings of Michael Cheromiah's condition;

36. Demonstrative aids used to show the oxygen saturation content of the blood;

37. Any and all personnel files of any treating healthcare provider involved in Michael Cheromiah's care or any ACL Hospital employee, including but not limited to Dr. Friedman, Dr. Hepnar and Dale Gaddis;

38. Selected documents from the materials Plaintiffs received from ACL Hospital in response to any discovery request or answer to any discovery interrogatory;

39. Curriculum Vitae of Dr. Sara Allen;

40. Curriculum Vitae of Dr. Robert Henry;

41. Curriculum Vitae of Dr. Jay Schapira;

42. Curriculum Vitae of Dr. Peter Rosen;

43. Any exhibits offered by the defendants.

### II. United States:19

Defendant USA may introduce the following exhibits at trial:

1. Medical records for Michael D. Cheromiah;

2. X-ray films and echocardiagram videotape of Michael D. Cheromiah

3. Alcohol counseling records for Michael D. Cheromiah

4. Police, motor vehicle and arrest records for Michael D. Cheromiah

5. Counseling records for Diane Cheromiah;

6. Arrest records for Michael Cheromiah, Sr.

---

19 Plaintiffs object to several of the government's proposed exhibits and will make their objections at the appropriate time.

7. Billing records for care and treatment of Michael D. Cheromiah;

8. Any exhibits appended to any of the depositions taken;

9. Demonstrative charts

10. Deposition transcripts and deposition excerpts of all individuals deposed in this action.

11. Demonstrative diagrams/photos of body parts and pericarditis;

12. Treatises on infectious disease, emergency medicine, and cardiology;

13. Education, tax, and employment records of Michael D. Cheromiah

14. Death Certificate for Michael D. Cheromiah

15. Any exhibits identified, marked, or offered by plaintiffs.

16. Video of Michael D. Cheromiah's family

17. Administrative claim filed by Cheromiah family

18. All complaints filed by the Cheromiah family against the United States in district court and in tribal court

19. Complaint and other documents related to Mrs. Cheromiah's wrongful termination suit

20. Medical instruments used during pericardiocentesis

21. Plaintiffs' and Defendants' experts' reports

22. Letters from James Bromberg to Doctors Allen and Rosen

23. Correspondence between counsel

24. Any pleadings or motions filed with the Court;

25. Curriculum Vitae of expert doctors Kuzina, Ketai, Mertz, Doezema, Lesch, and Blanchard.

The parties must confer over all trial exhibits except for rebuttal exhibits that cannot be anticipated before trial. The parties will file and serve an original plus three (3) copies of the parties' "consolidated exhibit list identifying all exhibits that the parties have stipulated are admissible" and a "consolidated exhibit list identifying all exhibits the parties have stipulated to be authentic, but to which there are other objections" no later than ~~July 2, 1999~~. 20 days prior to trial

For those exhibits on which a stipulation could not be reached, the offering party will
10 days prior to trial
file and serve a separate "contested exhibit list" no later than ~~July 2, 1999~~. An original plus three (3) copies of each party's contested exhibit list will be filed. In addition, two courtesy copies of the contested and uncontested exhibit lists will be delivered to the Judge's chambers.

All exhibits will be marked before trial. Exhibits will be marked numerically and will identify the party offering the exhibit. The identification number or letter will remain the same whether the exhibit is admitted or not.

All exhibits to which there is no objection will be offered and received into evidence as the first item of business at trial.

The parties will attempt to prepare as a joint exhibit a copy of all the relevant medical records from ACL Hospital and Presbyterian Hospital.

<u>**WITNESSES AND DEPOSITION TESTIMONY**</u>

*I.*    *Plaintiffs Cheromiah will call*:

William Patterson        Robert Henry, MD
Diane Cheromiah
Sara Allen, MD

25

**Plaintiffs Cheromiah may call:[20]**

| | |
|---|---|
| Jay Schapira, MD | Peter Rosen, MD |
| Judge Melvin Stoof | Ladeen Aragon |
| Susan Seidenberg | Carl Lagerstrom, MD |
| Wendy Sarracino | Barry Ramo, MD |
| Al Mendoza | Johana McNeil |
| Michael Cheromiah | Benedict Cheromiah |
| Astancio Cheromiah | Celena Cheromiah |
| Dr. Gerald Hepnar | Dr. Phillip Friedman |
| Dr. Maureen Kelly | Dr. Stefanie Fry |
| Dale Gaddis | Celestino Salas |
| Dr. Judith Thierry | |

Plaintiffs may call any Records Custodian necessary to authenticate any records.

Plaintiffs may call any Rule 26(A) witness listed by either Plaintiff or Defendant.

Plaintiffs may call any of the defense witnesses listed by Defendant United States.

---

[20] Without waiving its right to object to other witnesses listed by plaintiffs, the United States now notes its objection to Judge Melvin Stoof, a tribal court judge in an unrelated medical malpractice action, as a witness. Judge Stoof has never been identified as a Rule 26 witness. Moreover, he can have no testimony relevant to this Court's trial of the instant case. The United States will make its formal objections and file any necessary motions at the appropriate time.

## II. **Defendant USA may call**: 2122

Gary Kuzina, Phd.
Stefanie Fry, MD
Gerald Hepnar, MD
Phillip Friedman, MD
Maureen Kelly, MD
Barry Ramo, MD
Carl Lagerstrom, MD
Gilbert Gutierrez, M.D.
Brad Parker
Lisa Bagnoli
Ladeen Aragon
Alan Walker
Kathleen Van Osten, M.D.
James Stevenson, M.D.
Loren Ketai, MD
Gregory Mertz, MD
David Doezema, MD
Michael Lesch, MD
Daniel Blanchard, MD
Dr. Peter Rosen
Dr. Jay Schapira
Barbara Mathis, Esq.

Any of plaintiffs' experts or fact witnesses
Any ACL Hospital employee or former employee
Any Presbyterian Cath Lab tech or ER staff
Any Records Custodian necessary to authenticate any records.
Any Rule 26(A) witness, or any other witness, listed by either Plaintiff or Defendant

---

21 The parties have herein agreed that the deadline for identifying additional potential witnesses is June 18, 1999, and the deadline for submitting a final witness list is July 5, 1999. Accordingly, the following witness list is provisional at this time.

22 Plaintiffs object to Defendant's attempt to include witnesses that it cannot even name at this point in the case. For example, any employer or co-worker and any teacher or counselor of Michael D. Cheromiah's. Those witnesses have not been identified by name in this PTO and have never been identified at Rule 26 witnesses.

Any employer or co-worker of Michael D. Cheromiah
Any teacher or counselor of Michael D. Cheromiah
Any deponent in this case

In the event that there are additional witnesses, other than those identified above, to be called at trial, a statement of the name, address, telephone number, and a description of the subject matter of the testimony of each witness shall be served in writing upon opposing counsel no later than June 18, 1999. This restriction shall not apply to rebuttal or sur-rebuttal witnesses, the necessity of whose testimony reasonably cannot be anticipated before trial.

Thereafter, an original and three (3) copies of a party's witness list will be filed no later than 20 days prior to trial with the Clerk and served ~~on all parties by July 5, 1999~~. The lists will indicate whether the witness is testifying by deposition or in person, and, if by deposition, which pages and lines of the depositions counsel intends to use. Objections to use of deposition testimony are due within fourteen (14) calendar days of service of the witness list ~~-- thus no later than July 19, 1999~~. The objecting party must highlight those portions of the requested deposition testimony to which the party objects. Plaintiff must use a yellow highlighter and defendant must use a blue highlighter. The parties will confer about any disputes and, if unable to resolve any difference, will notify the Court in writing ~~by July~~ 10 days prior to trial ~~23, 1999~~.

## MOTIONS IN LIMINE

All motions in limine will be served no later than July 12, 1999. Responses to motions will be served no later than July 21, 1999. Replies, if any, will be served no later than July 23, 1999. The motions packets must be filed with the Court no later than

28

July 23, 1999.

## SERVICE

Service of all exhibit lists, witness lists, objections thereto, motions in limine and responses and replies thereto, proposed findings of fact and conclusions of law, and any other time-sensitive document served between June 4, 1999 and the time of trial shall be served by facsimile and/or by Federal Express, for next business morning delivery.

## PRE-TRIAL MOTIONS

I.    **Plaintiffs Cheromiah have filed the following motions:**

Plaintiffs' Motion for Partial Summary Judgment that the New Mexico Medical Malpractice Cap on Damages does not apply to the United States Government;

Plaintiffs' Motion for Partial Summary Judgment that Plaintiffs Should Prevail on their EMTALA Claims;

Plaintiffs Motion to Compel Complete Responses to their Second and Third Set of Requests for Production to Defendant.

II.   **Plaintiffs Cheromiah intend to file:**

Motions in Limine, as may be necessary.


III.  **Defendant United States has filed the following motions:**

Motion to Compel Interrogatory Responses;

Motion to Compel Videotape;

United States' Motion for Judgment on the Pleadings seeking dismissal of Plaintiffs' claim for loss of consortium;

29

Motion to Dismiss Counts I and II of the First Amended Complaint for Lack of Subject Matter Jurisdiction and to Dismiss ACL Hospital as a Party.

United States' Cross Motion for Summary Judgment that the New Mexico Medical Malpractice Cap on Damages does apply to the United States.23

**IV.     Defendant USA intends to file**

Motions in Limine, as may be necessary, and the possible motions to dismiss identified in paragraphs 2-4 below.

## DISPUTED LEGAL CONTENTIONS

1.     Plaintiffs contend that Defendant's liability under the FTCA must be determined by application of tribal law.  Defendant contends that its liability under the FTCA must be determined by application of New Mexico state law.

2.     In the portion of this pre-trial order captioned, "Plaintiffs' Legal Claims:  i.) FTCA Claims," Plaintiffs contend that "The government and ACL Hospital were on notice that ACL Hospital was inappropriately staffed with unqualified personnel, understaffed and providing substandard medical care to Indians on the reservation before and at the time of Michael D. Cheromiah's visit.  Despite that knowledge, the government failed to take steps to provide adequate health care to Indian patients like Michael D. Cheromiah."  The United States objects that plaintiffs are seeking to allege a new claim in the pre-trial order.  Plaintiffs have refused the United States' request for a more definite statement of, or any additional information about, this claim.  This claim was not raised in the complaint or amended complaint and is therefore untimely.  In addition, if the Court were to allow plaintiffs to add a claim that ACL Hospital was inappropriately or inadequately staffed, that claim would have to be dismissed for lack of subject matter jurisdiction both because it was not raised in plaintiffs' administrative claim and because it is barred by the discretionary function exception to the FTCA.  See 28 U.S.C. § 2680(a).  Count III of plaintiffs' First Amended complaint alleges medical negligence by federal employees under the FTCA and nothing more, and plaintiffs may not add additional claims by simply slipping them into the Pre-Trial Order.  It is telling that Plaintiffs would not agree to include the following sentence, proposed by Defendant for inclusion in the Modifications/Interpretations Section of the Pre-Trial Order:  "Neither party will be permitted to make any claims, advance any theories of liability, or raise defenses not identified herein."  Accordingly, if plaintiffs persist in making it, the United

---

23 United States' Cross Motion was served as part of its Response in Opposition to Plaintiff Diane Cheromiah's Memorandum in Support of Her Motion for Partial Summary Judgement that the New Mexico Medical Malpractice Cap on Damages does not apply to the United States Government.

States will be compelled to move to dismiss such claim because it is untimely and lacks subject matter jurisdiction.

3.      In the paragraph entitled "Plaintiffs Summary," plaintiffs write: "The United States government, by treaty, is responsible for supplying medical care on the Laguna, Acoma and other Indian reservations.  The government has failed to live up to its promise to provide competent doctors and proper medical care for Native American citizens who live in Indian country. "  Plaintiffs thereby, for the first time, suggest that they have a claim against the United States under the FTCA for breach of contract, breach of promise or breach of a treaty agreement.  No such claim has ever been alleged -- not in the administrative claim, not in the complaint, and not in the amended complaint. Indeed, it is unclear whether this is simply rhetoric, or the statement of a claim, and plaintiffs have again declined to give a more definite statement.  Plaintiffs have not, and cannot, cite any basis for the Court to assume subject matter jurisdiction over these claims, and the United States has not waived its sovereign immunity for the damages sought by plaintiffs on these "theories."  Accordingly, if plaintiffs persist in making this claim or claims, the United States will move to dismiss them as untimely and for lack of subject matter jurisdiction.

4.      Plaintiffs' counsel, in discussions held for the purpose of reaching agreement on portions of this Pre-trial Order, for the first time stated that plaintiffs have a claim of medical negligence against Dale Gaddis.  Once again, plaintiffs seek to insert new claims by slipping them into the Pre-Trial Order.  Dale Gaddis is a nurse who examined Michael D. Cheromiah at ACL Hospital on November 3, 1995.  There are no allegations against Dale Gaddis in the complaint or amended complaint.  None of plaintiffs' experts' reports addressed Dale Gaddis' conduct.   Dale Gaddis was deposed on January 26, 1999.  The first of plaintiffs' medical experts testified on February 20, 1999, and the last on March 25, 1999.  None of plaintiffs' experts testified at his/her deposition about Dale Gaddis' conduct.  Accordingly, the United States has no idea what duty plaintiffs believed Dale Gaddis breached, nor how that breach of duty proximately caused any harm to Michael D.  Cheromiah, or what harm plaintiffs believed Dale Gaddis caused.  In any event, under New Mexico law, to prevail on a claim of medical negligence plaintiffs must put on expert testimony.  No expert testimony about Dale Gaddis' conduct exists, and discovery closed on April 2, 1999. Thus, if the Court permits plaintiffs to pursue this untimely claim against Dale Gaddis, the United States will move to dismiss it or for summary judgment in its favor.

5.      Plaintiffs dispute many of the defendant's allegations contained in paragraphs 2-4 above.  If the government chooses to file a Motion to Extend the Dispositive Motions deadline this close to trial, Plaintiffs will address each of the allegations in their Response to the defendant's Motion.

## SUBMISSIONS FOR BENCH TRIALS

The parties will confer and submit one mutually approved set of proposed findings
of fact and conclusions of law no later than ~~July 28, 1999~~. *20 calendar days before trial.* On that same date, for those

findings of fact and conclusions of law the parties were unable to agree upon, each party

will submit its own proposed findings of fact and conclusions of law.

## JURY INSTRUCTIONS

The parties will submit proposed jury instructions to the Court no later than ~~July 30,~~

~~1999.~~ *20 calendar days before trial.*

## TRIAL SETTING

The non-jury trial on the FTCA claim is set for August 2, 1999.

The jury trial on the EMTALA claim is set for August 9, 1999.

## ESTIMATED TRIAL TIME

The parties estimate that each trial will require five (5) - seven (7) trial days.

## SETTLEMENT

The parties went to a settlement conference before Magistrate Judge Puglisi on

January 25, 1999. The parties agree that, given their respective positions on liability

and damages, settlement is highly unlikely.

## MODIFICATIONS-INTERPRETATION

The Pre-Trial Order when entered will control the course of trial and may only be

amended sua sponte by the Court or by consent of the parties and Court approval.

_____
U.S. DISTRICT COURT JUDGE

Dated: _June 8, 1999_

APPROVED :


_____
Randi McGinn
Kimberly Richards
Attorneys for Diane & Michael Cheromiah
420 Central Ave SW  Suite 200
Albuquerque, NM  87102
(505) 843-6161



telephonic approval June 6, 1999
Madeline Henley
Attorney for Defendant United States
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044