IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---

MICHAEL CHEROMIAH,
Individually, and DIANE M.
CHEROMIAH, Individually, and as
personal representative of the estate
of MICHAEL CHEROMIAH,
Deceased,                                              No. CIV 97-1418 MV/RLP

              Plaintiffs,

vs.

UNITED STATES OF AMERICA
and ACOMA CANONCITO
LAGUNA HOSPITAL,

              Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss Counts I and II of

the First Amended Complaint for Lack of Subject Matter Jurisdiction and to Dismiss ACL Hospital

as a Party, filed June 10, 1999 [**Doc. No. 105**]; Plaintiff's Motion for Partial Summary Judgment that

Plaintiff Prevails on her [Emergency Medical Treatment and Active Labor Act] EMTLA Claims

Against ACL Hospital, filed June 10, 1999 [**Doc. No. 113**]; Defendant's Motion for Judgment on the

Pleadings, filed June 10, 1999 [**Doc. No. 109**]; Defendants' Motion for Partial Summary Judgment

that the New Mexico Medical Malpractice Cap Does Not Apply to the U.S. Government, filed June

10, 1999 [**Doc. No. 117**]; Unopposed Motion by Defendant United States to File Surreply, filed June

21, 1999 [**Doc. No. 126**]; and United States' Motion to Strike Unsigned Changes to Plaintiffs'

Expert's Deposition Testimony, filed June 28, 1999 [**Doc. No. 134**]. The Court having considered

the motions, responses, replies, relevant law, and being otherwise fully informed, finds that Defendant's Motion to Dismiss Counts I and II and Plaintiffs' Motion for Partial Summary Judgement that the New Mexico Medical Malpractice Cap Does Not Apply to the U.S. Government are well taken and will be **GRANTED**; that Plaintiffs' Motion for Partial Summary Judgement that Plaintiff Prevails on her EMTLA Claims, Defendant's Unopposed Motion to File a Surreply, and Defendant's Motion to Strike Unsigned Changes will be **DENIED AS MOOT**; and that Defendant's Motion for Judgment on the Pleadings is not well taken and will be **DENIED**.

## BACKGROUND

Plaintiffs Michael Cheromiah (senior) and Dianne Cheromiah here bring suit against the United States Government, seeking damages for the death of their adult son, Michael Cheromiah (junior). Plaintiffs assert a claim for medical malpractice under the Federal Tort Claims Act, two claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), and a claim for loss of consortium.

For the purposes of resolving these motions, the Court finds that the following are the undisputed material facts:

Indian Health Services ("IHS"), an agency of the United States government, owns and operates the Acoma Canoncito Laguna Hospital ("ACL Hospital"), located within the bounds of Acoma tribal land. IHS operates ACL Hospital pursuant to a lease agreement with the Acoma Tribe. The hospital provides 24-hour emergency service primarily to members of the Acoma Tribe and residents of other neighboring reservations. ACL Hospital participates in the Medicare system, routinely making claims on behalf of its many Medicare eligible patients.

Michael Cheromiah (junior) went to the emergency room at ACL Hospital four times between October 31 and November 4, 1995, seeking treatment for an acute respiratory problem. Doctors at ACL Hospital failed to diagnose or treat what later turned out to be a bacterial infection, even after having been informed that Cheromiah's family physician suspected such an infection. When Cheromiah made his fourth and final trip to the emergency room, his condition was so dire that the attending physician ordered his immediate transfer to a hospital in Albuquerque offering more complete services. By the time Cheromiah arrived at the Albuquerque hospital he was in cardiac arrest. During the attempts to save his life, doctors discovered a hole in his heart caused by the undiagnosed and untreated bacterial infection. Despite the efforts to save him, Michael Cheromiah (junior) died on November 4, 1995. He was 20 years old.

Michael Cheromiah (junior) was an enrolled member of the Laguna Tribe. Dianne Cheromiah is an enrolled member of the Acoma Tribe and Michael Cheromiah (senior) is an enrolled member of the Laguna Tribe.[1]

Currently before the Court are numerous motions of the parties. The United States moves to dismiss the two claims pled under the EMTLA, arguing that the United States has not waived immunity from suit under these provisions and that this Court is therefore without jurisdiction to entertain these claims. Plaintiffs, for their part, have moved for summary judgment on the EMTLA claims and the United States has moved to file a surreply to this motion. Additionally, Plaintiffs seek partial summary judgment in their favor that the New Mexico Medical Malpractice Cap does not

---

[1]In addition to the forgoing, Plaintiffs assert numerous additional "undisputed facts" in support of their motions for summary judgement, some of which Defendant does in fact dispute. Because the Court does not find it necessary to reach the legal issues to which these facts relate, as explained below, the Court will not recite these facts here.

apply to the United States government, arguing in this context that Acoma tribal law should control this case. Finally, the United States seeks judgement on the pleadings as to Plaintiffs' claim for loss of consortium and seeks to substitute itself in place of ACL Hospital as a named defendant in the case.

## STANDARD OF REVIEW

### A.     Motion to Dismiss for Lack of Jurisdiction Under Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so. *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). The party seeking to invoke a federal court's jurisdiction sustains the burden of establishing that such jurisdiction is proper. *Penteco Corp. v. Union Gas System, Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction typically take two forms: a facial challenge or a factual challenge. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). A facial challenge is an attack on jurisdiction that questions the sufficiency of the complaint. *Id.* In reviewing a facial attack on a complaint, the court must accept the allegations in the complaint as true. A factual attack on subject matter jurisdiction challenges the facts upon which subject matter jurisdiction depends. *Id.* In reviewing a factual attack on subject matter jurisdiction, a court may not presume the truthfulness of the complaint's factual allegations but must go beyond the allegations and evaluate the evidence presented by the parties. *Id.* While the court may refer to evidence extraneous

4

to the complaint in making appropriate factual findings on jurisdictional issues, it generally cannot convert a 12(b)(1) motion into one for summary judgment. *Wheeler v. Hurdman,* 825 F.2d 257, 259 (10th Cir. 1987).

A court, however, is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when "resolution of the jurisdictional question is intertwined with the merits of the case." *Holt,* 46 F.3d at 1003; *Wheeler*, 825 F.2d at 259 n.5. "The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case." *Holt,* 46 F.3d at 1003.

### B. Motion for Judgement on the Pleadings Under Rule 12(c)

A Rule 12(c) motion for judgment on the pleadings is governed by the same standards as a Rule 12(b)(6) motion to dismiss. *Mock v. T .G. & Y.*, 971 F.2d 522, 528 (10th Cir. 1992). In reviewing a defendant's Rule 12(c) motion, the court assumes the veracity of the "well-pleaded factual allegations" in the complaint and draws all reasonable inferences in the plaintiff's favor. *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir. 1987); *see Zinermon v. Burch*, 494 U.S. 113, 118 (1990). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support his claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984). The court may dismiss a case for failure to state a claim only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his theory of recovery that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The harsh remedy of dismissal is to be used cautiously; courts have an obligation to promote the liberal rules of pleading as well as to protect the interests of justice. *Cayman Exploration Corp.*

*v. United Gas Pipe Line*, 873 F.2d 1357, 1359 (10th Cir. 1989)  When granting Rule 12(c) motions, courts may give leave to amend and "may dismiss causes of action rather than grant judgment." *Moran v. Peralta Community College Dist.*, 825 F. Supp. 891, 893 (N. D. Cal. 1993) (citing *Amersbach v. City of Cleveland*, 598 F.2d 1033, 1038 (6th Cir. 1978)).

### C.    Motion for Summary Judgment Under Rule 56

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating

to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

## ANALYSIS

The Court will first address whether the United States Government is immune from suit under the EMTLA. Finding that it is, the Court will dismiss Counts I and II of the Complaint and deny the other motions related to these counts as moot. The Court will then address whether ACL Hospital is a proper defendant under the remaining claims, concluding that the United States government should be substituted in place of the Hospital in the Complaint. The Court will then turn to Plaintiffs' Motion that the New Mexico Medical Malpractice Cap Does Not Apply to the United States government. Because the Court concludes that Acoma tribal law must control this case, the Court will likewise find that the New Mexico Malpractice Cap does not apply in this case. Finally, the Court will address Defendant's Motion for Judgement on the Pleadings as to Plaintiffs' loss of consortium claim. Because Defendant's argument regarding this count is based entirely on New Mexico law, which does not apply to this case, the Court will deny this motion at this time.

### 1.     Plaintiffs' EMTLA Claims and Sovereign Immunity

Plaintiffs may not pursue their EMTLA claims against the United States unless it has waived its sovereign immunity from suit under the statute. *Department of Army v. Blue Fox, Inc.*, 525 U.S. ___, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (Slip op., at 4); *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); *United States v. Nordic  Village, Inc.*, 503 U.S. 30, 34, 112

S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992); *United States v. Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990); *United States v. Murdock Mach. & Eng. Co.*, 81 F.3d 922, 929 (10th Cir. 1996); *James v. United States*, 970 F.2d 750, 753 (10th Cir.1992). "The policy behind this rule is that the government should not be hampered in its performance of activities essential to the governing of the nation, unless it has given its consent." *Murdock*, 81 F.3d at 930. It is Plaintiffs' obligation to prove a waiver of sovereign immunity. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983). Absent such a waiver, the Court lacks jurisdiction to hear Plaintiffs' claims. *Murdock*, 81 F.3d at 929; *James*, 970 F.2d at 753.

A waiver of sovereign immunity must be "'unequivocally expressed' in the statutory text." *Blue Fox,* 525 U.S. ___, 119 S.Ct. 687 (Slip op., at 4); *Lane*, 518 U.S. at 192; *Nordic Village*, 503 U.S. at 33; *Murdock*, 81 F.3d at 930; *James*, 970 F.2d at 753. "If waiver is not unequivocal from the text, the government retains its sovereign immunity. Legislative history cannot supply the necessary unequivocal expression." *Murdock*, 81 F.3d at 930. Further, "[a] waiver of sovereign immunity cannot be implied." *Id*. "Thus, Congress does not waive the government's sovereign immunity by granting a court jurisdiction to hear a claim." *Id*. (*citing Nordic Village*, 503 U.S. at 38, 112 S.Ct. at 1016-17; *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786-87, 111 S.Ct. 2578, 2584-85, 115 L.Ed.2d 686 (1991)). "As the Supreme Court stated in *Blatchford*, '[t]he fact that Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses to that claim. The issues are wholly distinct.'" *Id*. (*quoting Blatchford*, 501 U.S. at 787 n. 4).

The EMTLA provides, in pertinent part, as follows:

[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the

> participating hospital, obtain those damages available for personal injury under the law
> of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A). Although there are other enforcement mechanisms available under the Act, this is the only part that speaks to the private right to sue. *See* 42 U.S.C. § 1395dd(d).

As the text plainly shows, no mention is made of the United States government or any hospital owned or maintained by the United States. The statute thus contains no "unequivocally expressed" waiver of sovereign immunity. *See Lebron v. Ashford Presbyterian Comm. Hospital*, 975 F.Supp. 407, 409-410 (D.P.R. 1997) (EMTLA does not contain an unequivocal abrogation of State's Eleventh Amendment Immunity); *Perez-Bourdon v. Commonwealth of Puerto Rico*, 951 F.Supp. 22, 24 (D.P.R.1997) (same); *Vazquez-Morales v. Estado Libre Asociado de Puerto Rico*, 967 F.Supp. 42, 45-26 (D.P.R. 1997) (same). Rather, as the District Court of Puerto Rico observed in *Lebron, supra*, in enacting the EMTLA, "Congress only enacted a general authorization for suit, which did not constitute the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment," *Lebron*, 975 F.Supp. at 409 (discussing *Perez-Bourdon*, 951 F.Supp. at 24). Likewise, this general enactment of a right to sue is insufficient to waive the federal government's sovereign immunity from suit. *Nordic Village*, 503 U.S. at 38; *Murdock*, 81 F.3d at 930. Accordingly, the United States remains immune from suit under the EMTLA.

In an effort to resist this conclusion, Plaintiffs cite two district court cases for the proposition that the EMLTA contains "a waiver" of state sovereign immunity which, by implication, supports the conclusion that the United States has also waived immunity from suit under the statute. *See Helton v. Phelps County Regional Medical Center*, 817 F.Supp. 789, 791 (E.D.Mo.1993); *Huckaby v. East Alabama Medical Center*, 830 F.Supp. 1399, 1402 (M.D.Ala. 1993). However, neither case will bare

the weight Plaintiffs place on them. In *Helton*, the district court held that a state statute which granted immunity to a county hospital was preempted by the EMTLA. *Helton*, 817 F.Supp. at 791. Similarly, in *Huckaby* the district court held that the city hospital had waived immunity under a state statute and was therefore amendable to suit under the EMTLA. *Huckaby*, 830 F.Supp. at 1402. Neither of these cases are in any manner relevant to whether the United States has explicitly waived its sovereign immunity from suit in the EMTLA.

Plaintiffs also expend much energy arguing: (a) that the United State's government's sovereign immunity is implicitly waived by the fact that the statute provides for suit against any "participating hospital"; (b) that the legislative history expresses an intent for the statue to apply to public as well as private hospitals; and (c) that as a matter of public policy, the United States should be amendable to suit under the EMTLA. The Court, however, can give no weight or consideration to these arguments. As noted above, a waiver of immunity by the United States must be "unequivocally expressed in the statutory text." *Blue Fox,* 525 U.S. ___, 119 S.Ct. 687 (Slip op., at 4); *Lane*, 518 U.S. at 192; *Nordic Village*, 503 U.S. at 33; *Murdock*, 81 F.3d at 930; *James*, 970 F.2d at 753. The text does not contain an express, unequivocal waiver of sovereign immunity.

Accordingly, because the United States remains immune from suit under the EMTLA, this Court lacks subject matter jurisdiction over these claims and Counts I and II of the Complaint must be dismissed. All motions related to these Counts will also be denied as moot.

### 2. ACL Hospital as a Named Defendant

The United States next argues that under the remaining FTCA and associated loss of consortium claims ACL Hospital is not a proper defendant and requests that it be substituted in place of the Hospital. *See* 28 U.S.C. §§ 1346(b), and 2671-2680 (providing for substitution). Plaintiffs

argue only that ACL Hospital is a proper defendant to the EMTLA claims. Having dismissed these claims for lack of subject matter jurisdiction, this argument plainly fails. Further, as previously noted by this Court, "the law unequivocally provides for substitution." Memorandum Opinion and Order of February 24, 1999. Therefore, the United States Government will be substituted in place of ACL Hospital who shall be dismissed from the Complaint.

### 3.   The FTCA and the Application of Acoma Tribal Law

Plaintiffs' seek a ruling from this Court that the New Mexico Medical Malpractice Cap does not apply to the United States government. In this context, Plaintiffs argue that because the torts alleged in this case occurred within the exterior boundaries of the Acoma Tribe, on tribal land, the law of New Mexico does not apply to this case at all. Rather, Plaintiffs assert, the FTCA requires that the law of the Acoma Tribe govern this case. The United States responds that the law of New Mexico governs, as previously held by one court in this district.

The FTCA provides, in pertinent part, as follows:

the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346 (b)(1). Plaintiffs' argument that the law of the Acoma Tribe controls this case is simple and direct and based entirely on the text of the statute, as follows: the statutory text provides that the United States shall be liable "in accordance with the law of the place where the act or omission occurred;" the medical malpractice alleged in this case occurred within the boundaries of

the Acoma Tribe, on tribal lands; therefore, pursuant to the plain language of the text, the law of the tribe controls this case. The logic of this simple syllogism is compelling.

The Supreme Court has stated that "[i]t is clear . . . that the term 'place' in the Federal Tort Claims Act means the political entity . . . whose laws shall govern the action against the United States 'in the same manner and to the same extent as a private individual under like circumstances.'" *Hess v. United States*, 361 U.S. 314, 319, 80 S.Ct. 341, 345, 4 L.Ed.2d 305 (1960); *see also Ira S. Bushey & Sons, Inc. v. United States*, 276 F. Supp. 518, 524 (E.D.N.Y. 1967), *aff'd on other grounds* 398 F.2d 167 (2nd Cir. 1968). In *Hess*, applying this principle, the court held that the a claim arising from an accident on a river was governed by the laws of Oregon, the political entity within whose jurisdiction the river lay. *Hess*, 361 U.S. at 319. Likewise, other courts have recognized that "[i]n the vast majority of FTCA cases, [the] law [of the place] will, in fact, be the law of [the] state" in which the alleged tort occurred, *Southern Pac. Transp. Co. v. United States*, 462 F. Supp. 1193, 1213 (E.D. Cal. 1978). Indeed, lower courts and even the Supreme Court have routinely equated "the law of the place" as used in the FTCA with "the law of the state." *See Id.*; *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)("§ 1346(b)'s reference to the 'law of the place' means law of the State").

However, contrary to the assertion of the United States in its Response Memorandum and imprecise statements in the case law, "the law of the place" does not mean simply "the law of the state." Rather, it means just what it says, "the law of the *place*." Thus, in the District of Columbia, the law of the District is applied to FTCA claims, *Gelley v. Astra Pharmaceutical Products Inc.*, 610 F.2d 558, 560 (8th Cir. 1979); in Puerto Rico, the law of Puerto Rico is applied, *Soto v. United States*, 11 F.3d 15, 16 (1st Cir. 1993), *Borrego v., United States*, 790 F.2d 5, 6 (1st Cir. 1986); in Guam, the law of Guam is applied, *Taber v. Maine*, 67 F.3d 1029, 1033 (2nd Cir. 1995); in the U.S.

Virgin Islands, the law of the Virgin Islands is applied, *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 1997); and in the Canal Zone, the law of the Canal Zone is applied, *Dean v. United States*, 239 F.Supp. 167, 169 (M.D.Ala. 1965). None of these entities are states. Yet, they are the "political entities" in whose jurisdiction the alleged tort occurred. Thus, theirs is the "law of the place" which controls the FTCA action.

On the other hand, because this case involves questions of tribal jurisdiction, the situation presented here is more complex then with the territories. The FTCA makes the United States liable only "under circumstances where the United States, if a private person, would be liable" according to the law of the place. 28 U.S.C. § 1346 (b)(1); *see also Hess*, 361 U.S. at 319. Thus, the question arises as to whether a private person in like circumstances could be found liable under Acoma tribal law for the acts of negligence asserted here. More specifically, could a private entity that is, like the United States, *non-Indian,* be sued and be held liable for medical malpractice under Acoma tribal law?

Before addressing this question directly, the Court must pause to recognize the principles embodied in federal case law which inform any analysis of the exercise of Indian sovereign authority. The Supreme Court has recognized that, "[t]hrough various Acts governing Indian tribes, Congress has expressed the purpose of 'fostering tribal self-government.'" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 138, 102 SCt. 894, 71 L.Ed.2d 21 (1982). "Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations.' They are unique aggregations possessing attributes of sovereignty over both their members and their territory." *Id.* (citations and quotations marks removed). As this Court previously observed,

> [i]t is clearly established law that Indian tribes do not derive their sovereign powers from congressional delegation. Rather, tribal sovereignty is inherent, and tribes retain

'attributes of sovereignty over both their members and their territory, to the extent that sovereignty has not been withdrawn by federal statute or treaty.'

*Kerr-McGee v. Farley,* 915 F.Supp. 273, 277 (D.N.M. 1996) *aff'd* 115 F.3d 1498 (10th Cir. 1997)

(*citing Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 14, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987);

*United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2 303 (1978)); *see also Santa*

*Clara Pueblo v. Martinez*, 436 U.S. 49, 60, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

The Supreme Court has held that "Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). More recently, however, the Supreme Court has distanced itself from this broad declaration. *See Strate v. A-1 Contractors*, 520 U.S. 438, 445, 117 S.Ct. 1404, 1409, 137 L.Ed.2d 661 (1997) ("absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances"); *Montana v. United States*, 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) ("the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe").

Specifically, in *Montana, supra,* "the pathmarking case concerning tribal civil authority over nonmembers," *Strate*, 520 U.S. at 445, the Supreme Court held that the Crow Tribe lacked authority to regulate hunting and fishing by non-members on land owned in fee simple by non-Indians. *Montana*, 450 U.S. at 565. However, the *Montana* court continued to state that, even in the absence of an express delegation of authority from Congress or by treaty, tribal civil authority over nonmembers may exist in certain circumstances. *Id.* at 565-66. The court stated,

[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non- Indians on their reservations, even on non-Indian fee lands.

A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Id*. (citations omitted). As explained by the court in the more recent case, *Strate*, *supra*,

*Montana* thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on *non-Indian land* within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare.

*Strate*, 520 U.S. at 446 (emphasis added, citation omitted).

In *Strate*, the Court addressed whether the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara) had jurisdiction over a personal injury action against a non-Indian corporation as a result on an auto accident involving two non-Indians on a public highway maintained by the state pursuant to federally granted right-of-way over Indian lands. *Strate*, 520 U.S. at 442-44. In response to the argument that the rule of *Montana* did not control the case because the land underlying the highway was held in trust for the tribe, the court stated, "[w]e 'can readily agree,' in accord with *Montana*, that tribes retain considerable control over nonmember conduct on tribal land." *Id* at 454. "On the particular matter before us, however," the court concluded that "[t]he right-of-way North Dakota acquired for the State's highway renders the 6.59-mile stretch equivalent, for nonmember governance purposes, to alienated non-Indian land." *Id*.

Turning to the two *Montana* exceptions, the *Strate* court concluded that the first exception, for "activities of nonmembers who enter consensual relationships with the tribe or its members," did

not apply because the auto accident involved only non-Indians, and thus, "presents no 'consensual relationship' [with the Tribe] of the qualifying kind." *Id.* at 457. Regarding the second exception, conduct that threatens the "health or welfare of the tribe," the court recognized that careless driving "surely jeopardized the safety of tribal members." *Id.* at 458. "But," the court continued, "if *Montana's* second exception requires no more, the exception would severely shrink the rule." *Id.* The court cautioned that "[r]ead in isolation, the *Montana* rule's second exception can be misperceived." *Id.* at 459. Viewing the second *Montana* exception in the context of previous cases relating to tribal civil authority, the court concluded that because "[n]either regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve 'the right of reservation Indians to make their own laws and be ruled by them,'" the second *Montana* exception did not apply. *Id.* (*quoting Williams*, 358 U.S. at 220).

In the case at bar, the facts demonstrate that the United States government operates ACL Hospital pursuant to a lease with the Acoma Tribe and that the hospital is located within the exterior boundaries of tribal lands. The United States has not asserted that the Hospital sits on non-Indian owned land and the fact that the Hospital is operated pursuant to lease with the Tribe supports the inference that the land is also owned by the Tribe. However, the Court has unfortunately not been provided any information pertaining directly to the ownership of the land. This leaves the Court unduly hampered in resolving the issues currently before it.

Nevertheless, assuming that the Hospital sits on land which, although within the territory of the tribe, is some how subject to less tribal authority–as in *Strate* and *Montana*–the Court concludes that this case falls within both of the *Montana* exceptions for the exercise of tribal authority over non-tribal members. *See Montana*, 450 U.S. at 565-66. Specifically, ACL Hospital is operated pursuant

to a lease with the Tribe, bringing it within the first exception for "activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id*. The United States government has, by virtue of its own affirmative acts, entered into a lease and contract arrangement to provide medical and emergency services to the Acoma Tribe. As such, it has established a "consensual relationship" with the Tribe, specifically intended to benefit the Tribe. Pursuant to *Montana*, if a private party in like circumstances failed to meet those obligations, it would be appropriate to hold that individual accountable pursuant to the laws and standards of the Tribe. Thus, the Court concludes that the arrangement here between the United States and the Tribe presents a "'consensual relationship' of the qualifying kind," bringing it within the scope of the first *Montana* exception. *Strate*, 520 U.S. at 457; *Montana*, 450 U.S. at 565-66; *see also Louis v United States*, Case No. 97-CV-24, slip op. at 5, (Court of the Acoma Pueblo 1995) (finding tribal court jurisdiction over alleged negligence at ACL Hospital in part because the United States government entered "contractual arrangements to be performed on the Pueblo which directly impacts on the health and safety of members"), opinion disagreed with on other grounds by *Louis v. United States*, 967 F.Supp. 456 (1997).

Further, taking into consideration the limited scope of the second *Montana* exception as explained in *Strate*, the Court finds that this is one of the unique situations in which the conduct of non-members so impacts the "health or welfare of the tribe" that the second *Montana* exception applies as well. *Montana*, 450 U.S. at 555-56. Unlike *Strate*, this case does not present a routine auto accident between two non-Indians, nor even a routine tort between an Indian and a non-Indian. Rather, the United States government has undertaken the responsibility of providing the primary emergency medical care to the members of the Acoma Tribe. For all practical purposes, ACL

Hospital provides the only western medical care most Acoma Tribe members receive. Alleged medical malpractice at the Hospital has a direct and substantial impact on the health and welfare of the Tribe, more than would a simple isolated tort between individuals. The Court and the parties are well aware that this is not the only wrongful death action against ACL Hospital currently pending in this district. Malpractice by the major medical provider to the Tribe has a significant impact on "the right of reservation Indians to make their own laws and be ruled by them" as it may jeopardize their very ability to survive as a people. *See Strate*, 520 U.S. at 458. Again, if a privately run hospital on the reservation failed to provide medical services at the standard expected of such professionals, it would be reasonable to hold the owners of the hospital liable in accordance with the principles of liability found in the law of the Tribe. Therefore, the Court concludes that the second *Montana* exception is also met in this case because the conduct of the non-Indian, the United States government, has a "direct effect" on the "health [and] welfare of the tribe." *Montana*, 450 U.S. at 556; *see also Louis v United States*, Case No. 97-CV-24, slip op. at 5 (Court of the Acoma Pueblo 1995) (finding tribal court jurisdiction over alleged negligence at ACL Hospital in part because "[t]he appropriateness of medical treatment of individuals and any claim arising from alleged medical malpractice of tribal members at ACL Hospital are major concerns for the Pueblo . . . .").

Based on the forgoing, the Court finds that if the United States were a private person, it could be sued in Acoma Tribal Court for the alleged negligence of its agents. *See* 28 U.S.C. § 1346 (b)(1). Thus, the Court finds that the Acoma Tribe is the relevant political entity who controls the jurisdiction in which the alleged tort occurred. *See Hess*, 361 U.S. at 319. The Court is therefore compelled to conclude that the law of the Acoma Tribe is the "law of the place" within the meaning of the FTCA for this case. *Id*.

In reaching this conclusion, this Court must part ways with three unpublished district court opinions addressing the same issue, including one from this district.[2] In *Louis v. United States*, No. Civ 96-1161 BB/DJS, slip opinion at 5 (D.N.M. January 29, 1999), a case nearly identical to the one presented here, Judge Black of this district held that the law of New Mexico State rather than that of the Acoma Tribe controlled an FTCA-medical malpractice claim against ACL Hospital. Slip op. at 3. Likewise, the United States has provided the Court with opinions from the Western District Court of South Dakota and the Great Falls District Court of Montana, both also declining to apply tribal law to FTCA claims. *See Chips v. United States*, Civ. 92-5025, slip opinion at 3 (W.D.S.D. April 28, 1993); *Azure v. United States*, Cv-90-68-GF-PGH, slip opinion at 9-10 (D.Mon. May 9, 1991). This Court must respectfully disagree with each of these opinions, as explained below.

In *Louis*, *Chips*, and *Azure*, all three courts observe that the law of the state in which the reservation is located has routinely been applied to FTCA claims arising from on reservation conduct. *Louis*, slip op. at 4; *Chips*, slip op. at 4; *Azure*, slip op. at 8; *cf. Hatahley v. United States*, 351 U.S. 173, 180 (1956); *Red Elk v. United States*, 62 F.3d 1102 (8th Cir. 1995); *Red Lake Band of Chippewa Indians v. United States*, 936 F.2d 1320 (D.C.Cir. 1991); *Seyler v. United States*, 832 F.2d 120 (9th Cir. 1987); *Big Head v. United States*, 166 F.Supp. 510 (D.Mont. 1958). Yet, in none of these case was the application of tribal law ever raised as an issue. Perhaps this is because the idea did not occur to the plaintiffs, or perhaps it is because the tort law of the particular tribe was not well developed. Regardless, all this demonstrates is that tribal law has never before been applied to an

---

[2]The Court has not found and the parties have not cited any published opinions addressing this issue.

FTCA claim. But the fact that it has never been done, standing alone, does not mean that it is not what the law requires.

Next, *Louis* and *Chips* both note that "Plaintiff does not offer any supporting authority for the proposition that tribal law should be applied as 'the law of the place' under the FTCA." *Louis*, slip op. at 5; *Chips*, slip op. at 4. Even accepting this as true, it merely restates the point noted above, i.e., that this has never been done before. More importantly however, it is incorrect. Plaintiffs offer the statutory text as supporting authority for their argument. They need nothing else.

*Azure* is the only case of the three to actually address whether a private person standing in the shoes of the United States in that case would be amendable to suit in tribal court and therefore subject to the laws of the tribe. *Azure, supra*, slip op. at 10-11. *Azure* involved a non-Indian who was injured in a car accident allegedly caused by an Indian, employed by the federal government. *Id*. at 1-2. The non-Indian filed a FTCA claim in federal court against the United States government and the United States filed for indemnity against the Indian driver-employee. The district court was presented with a motion to dismiss by the Indian driver, arguing that he should be sued first in tribal court, or in the alternative for the application of tribal law under the FTCA. *Id*. at 7. Addressing the later argument, the court noted that the parties had failed to provide information regarding the ownership status of the property where the accident occurred. Assuming that the more restrictive standards for tribal authority governed, the court applied the *Montana* test and determined that neither exception applied. *Id*. at 10. Regarding the second prong, the court stated it was "unconvinced that the commission of an act of negligence by a nonmember 'so threatens the Tribe's political or economic security as to justify tribal regulation." *Id*. Oddly, the court made no effort to address the more obvious argument: that the negligence directly effected the health or welfare of the tribe. Regardless, the present facts

are distinguishable from *Azure* in that the Court has determined that both *Montana* exceptions apply, for the reasons discussed above.

Returning to *Louis*, which is, for all practical purposes, identical to the current case, Judge Black also stated that the parties failed to provide him with sufficient information to determine the ownership status of the lands where ACL Hospital is located. *Louis, supra*, slip op. at 5, n.5. Judge Black did not discuss or apply the *Montana* test which would govern tribal jurisdiction in this case assuming the most restrictive form of authority over the land in question. *See Id*. Rather, Judge Black observed that the application of tribal law to FTCA claims would be impractical because "it would subject the United States to varying and often unpredictable degrees of liability depending on the reservation that was the site of the occurrence." *Id*. at n. 5. He concluded that "[t]he Court does not believe Congress intended such a result when adopting the FTCA . . . ." *Id*. Judge Black then held, without further explanation, that New Mexico law governed the case. *Id*.

It is here that this Court must respectfully disagree with the reasoning of *Louis*, *supra*. The FTCA specifically provides for "varying and unpredictable degrees of liability" by specifically providing that the law of the place where the tort occurred shall control. *See* 28 U.S.C. § 1346 (b)(1); *Richards v United States*, 369 U.S. 1, 7, 82, S.Ct. 585, 590, 7 L.Ed.2d 492 (1962). This is in keeping with the concept embodied in the FTCA that the government should be liable to the same extent as a private person would be in like circumstances. *See* 28 U.S.C. § 1346 (b)(1); *Richards*, 369 U.S. at 7. It also reflects the long held belief in this nation that liability for tort damages should be judged by the standards of the local community in which the harmful act occurred. *See Richards*, 369 U.S. at 7. As noted above, a private person standing in the government's shoes in this case would be subjected to tribal law. It is not apparent to this Court why the government, having voluntarily

entered a lease to provide medical services to the Tribe and having expressly committed itself to a similar standard of liability as any private entity, should now be accorded some special consideration due to the diversity of tribal law. More importantly, it is a conclusion unsupported by the text of the statute or the case law.

Undoubtedly, as previously observed by this Court, "the 550 Tribes [currently recognized in this nation] clearly out rank the 50 states and various territories in number . . . ," leading to a greater degree of variability than if the law of the state controlled all FTCA claims. *NLRB v. Pueblo of San Juan*, 30 F.Supp.2d 1348, 1355 (D.N.M. 1998). However, "in the absence of any Congressional statement on the point, this Court is not in a position to guess how much diversity of opinion is too much. Given that Congress has specifically chosen to allow a diversity of approaches on this issue among the states, it is simply speculation to assert that the same deference would not be accorded to the Indian Tribes." *Id.* (*citing Iowa Mutual*, 480 U.S. at 18; *Merrion, supra,* 455 U.S. at 151).

Further, the United States government stands in a unique situation in that is has also committed itself to numerous treaties with the tribes. *See Tsosie v. United States*, 825 F.3d 393, 403 (Fed. Cir. 1987). These treaties themselves confer rights on the members of the tribe against the federal government which, in some cases, already subjects the government to "varying degrees of liability" depending on the reservation on which the alleged tort occurred. *Id.* In *Tsosie, supra*, for example, a Navajo woman brought a suit pursuant to treaty for a sexual assault by a government employee in an IHS hospital. The plaintiff invoked a "bad man" treaty provision which provided that United States government would compensate tribal members for wrongs committed against them by "whites." *Id.* at 394. The Federal Circuit Court of Appeals concluded that the provision was not obsolete and that the suit could proceed. *Id.* at 403. As this case demonstrates, the United States must

already contend with provisions of treaty law regarding its conduct on reservations. To conclude that it must also adhere to the requirements of tribal law–when a private individual in similar circumstances would have to–should not be a significant additional burden.

Finally, "[a]mbiguities in federal law have been construed generously in order to comport . . . with traditional notions of sovereignty and with federal policy encouraging tribal independence." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143-44, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Thus, even if the Court were to conclude that the FTCA choice of law provision is ambiguous, which it does not, the Court would have to interpret any ambiguities in favor of tribal sovereignty and tribal independence. *Id*. This Court could only conclude that the Acoma tribal law of negligence applies to a private person in like circumstances but not to the United States government if it failed to accord the Tribe the respect it is due as a distinct and sovereign political entity. This the Court will not do.

The United States makes two additional arguments which the Court should address but which may be rejected quickly. First, the United States asserts that if the law of the tribe is applied to this case, then this will some how triggers the FTCA exception for torts which occur in foreign countries. *See* 28 U.S.C. § 2680(k); *Smith v. United States*, 507 U.S. 197, 201, 113 S.Ct. 1178, 1181, 122 L.Ed.2d 548 (1993). While "Indian tribes and the federal government are dual sovereigns," *Kerr-McGee*, 915 F.Supp. at 276, the tribes are not foreign countries under any definition of the term. See Organized Village of Kake v. Egan, 369 U.S. 60, 72, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962)(observing that the power to enter treaties with Indian tribes was abolished by Congress in 1871 based on the recognition that the tribes were part of this country, not foreign nations); *Oneida Indian Nation of New York v. New York*, 691 F.2d 1070, 1089 (2nd Cir. 1982). Thus, the foreign country exception

does not apply to torts which occur on tribal lands. Second, the government argues that because wrongful death actions were not recognized "at common law," Plaintiffs' claims are dependent on the New Mexico wrongful death statute, requiring the application of all New Mexico law. *See Buchea v. United States,* 154 F.3d 1114, 1114 (9th Cir. 1998)(where plaintiffs' wrongful death action was based on Alaska law and under Alaska law tribal adoption by grandparents severed rights of surviving child, plaintiffs could not rely on more limited concept of adoption recognized in tribal law). The Court agrees that Plaintiffs may not pick and choose those provisions they like from New Mexico and Acoma tribal law in pursuing their claims. *Id.* However, the United States has failed to establish that Plaintiffs' wrongful death claim is dependent on the New Mexico statute. In particular, the fact that New Mexico did not recognize a common law cause of action for wrongful death has no relevance to whether the Acoma Tribe recognized such a right. Indeed, the only precedent currently before this Court specifically finds that a wrongful death claim may be pursued under Acoma tribal law. *Louis v United States*, Case No. 97-CV-24, slip op. at 3 (Court of the Acoma Pueblo 1995). Therefore, while Plaintiffs may not now rely on the New Mexico wrongful death statute, they can rely on Acoma tribal law precedent to establish their right to recovery.

In sum, the Court finds that, assuming the most restrictive scope of tribal authority over the lands in question, the Acoma Tribe would still have jurisdiction over a private, non-Indian entity standing in the government's shoes, pursuant to both of the *Montana* exceptions. Accordingly, the Court finds that the Acoma Tribe is the "political entity" whose laws control the place where the alleged negligence occurred and, therefore, that Acoma tribal law is the "law of the place" under the FTCA. Thus, the Court holds that Acoma tribal law governs this case.

In the interest of judicial economy, the Court will *sua sponte* certify this issue for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). As the Court's review of the case law demonstrates, there is "substantial ground for difference of opinion" on this issue. 28 U.S.C. § 1292(b); *see Young v. Nationwide Life Ins. Co.*, 2 F.Supp.2d 914, 930 (S.D. Tex. 1998); *Public Interest Research Group v. Hercules, Inc.*, 830 F. Supp. 1549, 1555 (D. N.J. 1993); *Lamont v. Schultz*, 748 F. Supp. 1043, 1057 (S.D.N.Y. 1990). In addition, the Court finds that an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Tenth Circuit has recognized that certification is appropriate where "extended and expensive proceedings probably can be avoided by immediate final decision of controlling questions encountered early in the action." *Utah State Dep't of Health v. Kennecott Corp.*, 14 F.3d 1489, 1495 (10th Cir. 1994) (citation omitted). In the absence of an appeal, the parties may well proceed to trial under an entirely inappropriate body of law, one which will substantially change the outcome for the government in this case (see discussion below). Since this is a case where "interlocutory reversal might save time for the district court, and time and expense for the litigants," immediate interlocutory appeal is warranted. *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (citation omitted).

### 4. New Mexico Medical Malpractice Cap

Plaintiffs seek a ruling that the New Mexico Medical Malpractice Cap does not apply to the United States in this case. *See* N.M.S.A. § 41-5-6(A) and (B) (limiting recovery in malpractice cases to $600,000). If the Court were to apply New Mexico law to this case, it would likely conclude that the cap does in fact apply. *See Louis v. United States*, No. Civ 96-1161 BB/DJS, slip op at 7-9 (D.N.M. Jan. 29, 1999); *Vincoy v. United States*, No. Civ 97-296 JC/LFG, slip op at 7-9 (D.N.M. June 1, 1999). However, Judge Stoof of the Acoma Tribal Court has already held that the New

Mexico Medical Malpractice Cap "is repugnant to the traditions and customs of the Pueblo to adequately compensate injured parties." *Louis v United States*, Case No. 97-CV-24, slip op. at 14 (Court of the Acoma Pueblo 1995). Therefore, because the Court has held that Acoma tribal law controls this, the Court must also conclude that the New Mexico Medical Malpractice Cap does not apply in this case. *Id*.

### 5.     Plaintiffs' Loss of Consortium Claims

Defendant asserts that New Mexico does not recognize a loss of consortium claim brought by the parents of an adult child. It is true that although New Mexico recognizes loss of consortium claims for the death of a minor child, State law does not permit such claims for the parents of an adult child. *See Solon v. WEK Drilling Co., Inc.,* 113 N.M. 566, 650, 829 P.2d 645 (N.M. 1992)(loss of consortium not available for parents for death of adult child); *Fernandez v. Walgreen Hastings Co.,* 968 P.2d 774 (N.M. 1998)(recognizing claim for care givers who live with minor child). However, the parties have provided the Court with no information as to how Acoma tribal law treats such claims. Because Defendant's argument is entirely based on New Mexico law, which does not govern this case, the Court will at this time deny the motion as not well taken. The Court will however grant Defendant leave to file a new motion to dismiss the loss of consortium claim, based on tribal law or based on New Mexico law if there is no tribal law precedent on this issue. *See Taber v. Maine*, 67 F.3d 1029, 1033 (2nd Cir. 1995)(stating the rule of the Ninth Circuit that in cases under the law of Guam in which that body of law fails to address a particular issue, the law of California governs). Alternatively, the United States may address this issue in its trial brief, as ordered by the Court below.

### 6.     Trial Briefs

Finally, in case the United States chooses not to appeal the ruling of the Court immediately, and in anticipation of the pending trial date, currently one month away, the Court hereby orders the parties to submit trial briefs outlining the application of Acoma tribal law to the facts of this case. In the event that the government does not appeal, both briefs shall be due ten days prior to trial. The briefs shall not exceed thirty (30) pages and the parties shall provide the Court with copies of all decisions and statutes cited.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Counts I and II of the First Amended Complaint for Lack of Subject Matter Jurisdiction and to Dismiss ACL Hospital as a Party [**Doc. No. 105**] is hereby **GRANTED**; Plaintiff's Motion for Partial Summary Judgment that Plaintiff Prevails on her EMTLA Claims Against ACL Hospital [**Doc. No. 113**] is hereby **DENIED AS MOOT**; Defendant's Motion for Judgment on the Pleadings [**Doc. No. 109**] is hereby **DENIED**; Plaintiffs' Motion for Partial Summary Judgment that the New Mexico Medical Malpractice Cap Does Not Apply to the U.S. Government [**Doc. No. 117**] is hereby **GRANTED**; Unopposed Motion by Defendant United States to File Surreply [**Doc. No. 126**] is hereby **DENIED AS MOOT**; and United States' Motion to Strike Unsigned Changes to Plaintiffs' Expert's Deposition Testimony [**Doc. No. 134**] is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Counts I, and II are hereby **DISMISSED WITH PREJUDICE**. Further, the United States government shall be substituted in place of ACL Hospital who shall be **DISMISSED** from the Complaint. In addition, the question of whether Acoma tribal law applies to this case is hereby certified for immediate interlocutory appeal. The United States is

also granted leave to file a second motion to dismiss the loss of consortium claim, addressing Acoma tribal law. Finally, in the event that the government chooses not to appeal immediately, the parties are hereby ordered to submit trial briefs ten days prior to the trial date, as explained in the body of this opinion.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff:</u>
    Randi McGinn

<u>Attorneys for Defendants</u>:
    Ronald F. Ross
    Madeline Henley